**UNITED STATES of America,**
**Plaintiff,**

v.

**Albert David HAJDUK, and Luxury**
**Wheels O.E. Plating Inc.,**
**Defendants.**

**No. CRIM.04–CR–346–B.**

United States District Court,
D. Colorado.

March 16, 2005.

---

Patricia W. Davies, David Robert Steinman, United States Attorney's Office, Denver, CO, for Plaintiff.

John M. Richilano, Richilano & Ridley, PC, Bruce F. Black, Holme, Roberts & Owen, LLP, Denver, CO, Eric Bentley, Holme, Roberts & Owen, Colorado Springs, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

The Grand Jury returned a second superseding indictment against Defendants on March 10, 2005. The second superseding indictment contains 19 substantive counts relating to criminal violations of the Clean Water Act ("CWA") and Resource Conservation and Recovery Act ("RCRA"). Defendants move in their "Motion # 1" to dismiss Count 1, to strike overt acts, or, in the alternative, for a bill of particulars. In their "Motion # 4," they move to dismiss Count 18 (formerly Count 14) or in the alternative, for a bill of particulars. In their "Motion # 6," they move for a Bill of Particulars as to Counts 16 and 17 (formerly Counts 12 and 13). The parties submitted these motions on their papers.

## I. Background

Defendant Albert David Hajduk is the plant manager of Defendant Luxury Wheels O.E. Plating, Inc., of Grand Junction, Colorado. Luxury Wheels electroplates automobile wheels with chrome, and has done so since 1993. In the course of its operations, it generates hazardous wastes that are regulated under state and federal law.

Luxury Wheels was issued a wastewater discharge permit under CWA, 33 U.S.C. § 1251 et seq., which allowed it to discharge specified wastes into Grand Junction's Persigo Publicly Owned Treatment Works ("POTW").

Defendants contend that Luxury Wheels "did its best to comply with these permits although it would be the first to concede that its history of compliance is not perfect." Prior to the events forming the basis for the second superseding indictment, Luxury Wheels had been cited infrequently for discharge violations throughout its existence.

The wheel-plating operation involves the following elements. First, wheels are subjected to heated and pressurized chemical washes, corrosive baths, rinse tanks, and metal baths to layer and build up the wheels' surfaces with chromium, nickel, copper, and zinc. Second, an on-site wastewater treatment system pre-treats industrial waste waters. This system consists of a pH-neutralization tank; a clarification tank that removes heavy metals by polymer/flocculent adhesion and gravity; a settling tank where the liquid and particles further separate; a filter press, where the flocculent is made into solid filter cakes; and a final collection tank. Finally, a storage outbuilding separate from the plating line holds waste waters for on-site treatment or before sending it off-site to hazardous-waste handlers.

In November 2003, following administrative hearings conducted by Persigo, Luxury Wheels applied for a "zero-discharge" permit. It ceased all industrial discharges at that time, and suspended plating operations until a new closed-loop treatment system was installed in February 2004. It has been operating under the zero-discharge permit since December 2003, so

that currently no wastes from plating operations are discharged into the POTW.

The second superseding indictment in this case followed investigative activity beginning in the fall of 2001, including secret sampling by Persigo and criminal investigators from the Environmental Protection Agency, who operated under a court-authorized search warrant. The second superseding indictment alleges nineteen counts: Count One is for conspiracy; the second count is for negligent violation of the Clean Water Act; Counts Three through Seven allege knowing violations of the CWA; Counts Eight through Fifteen allege knowing creation and use of false statements; Count Sixteen is for knowing storage of hazardous waste without a permit; Count Seventeen alleges knowing material omissions under RCRA; the eighteenth and nineteenth counts are for negligent violation of the CWA.

The government argues that Luxury Wheels substantially under-reported its hazardous waste production over a number of years. The government also alleges that when Luxury Wheels employees knew Persigo workers were sampling, they altered Luxury Wheels' operations to appear compliant with their permit. When Persigo became suspicious and sampled secretly, it found consistent and significant violations. The government alleges that Luxury Wheels employees made a hole through the wall of their building into Persigo's enclosed, locked sampling box to spy on Persigo's sampling efforts. It says that Luxury Wheels diluted its wastewater with tap water and/or forced tap water into Persigo's sampling bottles.

Because Persigo perceived that its notification to Luxury Wheels of CWA violations resulted not in compliance but in tampering with the samples, Persigo officials contacted the EPA's Criminal Investigation Division. The EPA obtained a search warrant in 2002 which allowed it to obtain surreptitious samples from a manhole location and retrieve documents and further samples from Luxury Wheels' premises.

The government contends that the clearest example of Defendants' unwillingness to comply with their permit obligations was their improper permit-less storage of reactive and toxic hazardous wastes that resulted in a July 15, 2002 uncontrolled chemical reaction and off-gassing from an illegal open storage tank. This resulted in Luxury Wheels, and Hajduk personally, contacting the Grand Junction Fire Department's HazMat Squad to report a "chemical reaction." The HazMat Squad responded, and evacuated Luxury Wheels and the surrounding area. Several city police and fire personnel complained of chest and lung pain. Despite witnessing and participating in the HazMat incident, Defendant Hajduk failed to disclose on the RCRA-required documentation that the waste, containing AlumEtch–G, was reactive and toxic.

Defendants do not argue that their compliance with the environmental laws was perfect or even adequate. They do contend, however, that their actions were not criminal.

## II. Discussion

### A. Defense Motion # 1: Count 1

#### 1) Motion to Dismiss

In Count One, the government alleges that Defendants and "others known and unknown to the grand jury" conspired to: 1) operate Luxury Wheels in violation of its permit and the Clean Water Act; 2) knowingly discharge pollutants into the POTW in violation of the permit and the CWA; 3) make and use knowingly false statements and to submit false documents to the POTW; and 4) falsify, tamper with, and render inaccurate monitoring devices and methods required by the CWA in vio-

**1108**

lation of the permit and the CWA. In support, the government lists 33 overt acts allegedly committed by Defendants. :

The original indictment was returned August 11, 2004. A summons was served on Defendants the next day. Defendants made their initial appearances pursuant to Fed.R.Crim.P. 9 and 18 U.S.C. § 3161, on August 25, 2004. The original indictment alleged 12 separate overt acts in Count One. The first superseding indictment was returned on November 1, 2004. It alleged the same substantive conspiracy, but added 11 new overt acts to Count One.

The second superseding indictment-at issue here-was returned March 10, 2005, and adds another 10 overt acts to Count One. It expands the alleged conspiracy duration from May 1999–September 2003 to May 1999–November 2003. It also adds two entirely new conspiracy objectives: 1) making and using false documents in violation of 18 U.S.C. § 1001(a)(3) and Luxury Wheels' permit; and 2) falsifying, tampering with, and rendering inaccurate monitoring devices and methods required by the CWA in violation of the permit and 33 U.S.C. § 1319(c)(4). Finally, it lists two entirely new "means by which the objects of the conspiracy were to be accomplished": # 4, operating the electroplating operation when Defendants knew the on-site treatment system was malfunctioning, thereby failing to adequately treat wastewater; and # 7, knowingly and willfully making and using false documents including "Self-monitoring Reports" in which Defendants allegedly "substantially understated" their daily average and/or total monthly wastewater discharges.

■ Defendants first contend that Count 1 of the second superseding indictment should be dismissed because it violates the Speedy Trial Act. They argue that the second indictment merely "gilds" the initial Count 1 charge, and does not substantively change it.

Under the Speedy Trial Act, 18 U.S.C. § 3161(b), "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with the charges." The parties argue at length whether § 3161(b) applies to superseding indictments where, as here, defendants were indicted, then served with a summons, but never arrested. Defendants contend that the statute applies to this case, and that the second superseding indictment was not only a mere "gilded" version of the original, but was brought many months after the 30-day period, which began on the summons date of August 12, 2004. The government contends that Defendants "defy" the language and rationale of the Speedy Trial Act. I agree with the government.

The Speedy Trial Act was meant in part to ensure that accused individuals do not suffer for more than thirty days without being formally charged. "The Act contains two main time limits: the limit in § 3161(b) running from arrest or summons to indictment, and the seventy-day limit in § 3161(c) running from indictment to trial. The purpose of the former, the thirty-day limit at issue in this case, is to insure that individuals will not languish in jail or on bond without being formally indicted on particular charges." *United States v. DeJohn*, 368 F.3d 533, 538 (6th Cir.), *cert. denied*, —— U.S. ——, 125 S.Ct. 510, 160 L.Ed.2d 373 (2004). Defendants were indicted on August 11, then served a summons on August 12. They were formally charged *before* being summoned. So, the 30-day limit meant to protect those who are accused but would suffer for lack of formal indictment was never triggered in this case.

■ Therefore, § 3161(b) has no application here. Because that section does

not apply, Defendant's contention that the second superseding indictment is merely a "gilded" version of the original indictment and was not brought within the 30–day window fails. Even so, out of an abundance of caution, my analysis of the second superseding indictment shows that it is not simply an "embellished" version of the original.

> As a general rule, new Speedy Trial Act periods begin to run with respect to an information or indictment adding a new charge not required to be brought in the original indictment. However, when the later charge is merely a part of or only "gilds" the initial charge, the subsequent charge is subject to the same Speedy Trial Act limitations imposed on the earlier indictment.

*United States v. Andrews,* 790 F.2d 803, 808–09 (10th Cir.1986) (internal citations removed). A gilded charge is "one that merely annotates in more detail the same charge alleged in the initial accusatory instrument." *United States v. Bailey,* 111 F.3d 1229, 1236 (5th Cir.1997). To determine whether a subsequent charge gilds the same charge in the original indictment, the Fifth Circuit applies the "same-elements" or *Blockburger* test, which inquires into "whether each offense contains an element not contained in the other; if not; they are the same offense." *Id.; Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). That test is commonly used to evaluate Double Jeopardy issues, but the Tenth Circuit has not adopted it to test superseding indictments under the Speedy Trial Act. That said, Fifth Circuit precedent is persuasive, and the Tenth Circuit has not indicated that it would *not* adopt the test in this light.

■ The test: "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Anderson v. Mullin,* 327 F.3d 1148 (10th Cir.2003) (a Double Jeopardy case), citing *Blockburger,* 284 U.S. at 304, 52 S.Ct. 180. Defendants urge me to apply it here to assess whether the elements of the violations charged in Count One as stated in the second superseding indictment are contained in Count One of the original indictment.

Count One of the original indictment is a conspiracy charge under 18 U.S.C. § 371. So is Count One of the second superseding indictment. 18 U.S.C. § 371 states:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

To be convicted of conspiracy, the government must prove beyond a reasonable doubt that Defendants conspired to commit one or more underlying offenses. The original indictment listed the following "objects" of the conspiracy: 1) operation of Luxury Wheels in violation of effluent and pretreatment standards under 33 U.S.C. § 1317(d) and the permit; 2) negligent discharge of pollutants to the POTW in violation of the permit and 33 U.S.C. § 1319(c)(1)(A), § 1311(a), and § 1317(b); and 3) knowing discharge of pollutants to the POTW in violation of the permit and 33 U.S.C. § 1319(c)(2)(A), § 1311(a), and § 1317(b).

The second superceding indictment retains object #1: operation of Luxury Wheels in violation of effluent and pretreatment standards under 33 U.S.C. § 1317(d) and the permit. It removes the second "object," negligent discharge, but keeps the knowing discharge of pollutants

to the POTW in violation of the permit and 33 U.S.C. § 1319(c)(2)(A) (but not § 1311(a), and § 1317(b)) and makes it object # 2. And it adds two wholly separate "objects" of the conspiracy: 3) making and using false documents in violation of 18 U.S.C. § 1001(a)(3) ("makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry") and Luxury Wheels' permit; and 4) falsifying, tampering with, and rendering inaccurate monitoring devices and methods required by the CWA in violation of the permit and 33 U.S.C. § 1319(c)(4).

I conclude that while Count One remains grounded in 18 U.S.C. § 371, changes to the underlying objects of the conspiracy-the independent alleged crimes with which Defendants are charged in other counts of the second superceding indictment that form the basis for the conspiracy charge-more than merely "gild" or "embellish" Count One in the second superseding indictment. Two of the four objects substantively change the character of the charge and require wholly different elements than the objects set forth in the original indictment. Moreover, the original Count One is altered significantly by expanding the time frame of the conspiracy and adding 21 new overt acts.

To the extent Defendants contend that certain of the "overt acts" listed by the government should be stricken from the indictment, I conclude that all 33 of them further the conspiracy alleged with regard to at least one of its four components. *See United States v. Stoner,* 98 F.3d 527, 530–531 (10th Cir.1996) ("the purpose of [the overt act must be] to further the object of the conspiracy"). Moreover, I conclude that because the government intends to prove all 33 "overt acts" at trial, they cannot be considered surplusage. *See United States v. Climatemp, Inc.,* 482 F.Supp. 376, 391 (N.D.Ill.1979), *aff'd sub.*

*nom., United States v. Reliable Sheet Metal Works,* 705 F.2d 461 (7th Cir.1983). *Accord United States v. Thomas,* 875 F.2d 559, 562 (6th Cir.1989).

Specifically, Defendants contend that three overt acts allege conduct that is relevant only to RCRA and not to the CWA, which forms the underlying basis for the conspiracy charge. The overt acts in question allege: 1) Defendants stored industrial wastewaters contaminated with AlumEtch–G, which was both reactive and toxic, and caused a HazMat incident (# 21); 2) Defendant Hajduk failed to disclose that the waste was reactive and toxic (# 22); and 3) he provided hazardous waste manifests to Persigo that contained false information (# 28).

The government contends these are overt acts that directly furthered the conspiracy as charged. First, with regard to # s 21 and 22, CWA pretreatment reporting requirements mandate descriptions of Defendants' operations and disclosure of information regarding their regulated waste streams. *See* C.F.R. part 403.12 (Clean Water Act reporting regulations for POTWs and industrial users). Second, also with regard to # s 21 and 22, Congress "dove-tailed" or combined aspects of both the CWA and RCRA to cover industrial dischargers who use hazardous materials and generate hazardous waste, thereby incorporating RCRA hazardous-waste definitions into the point-source regulations relevant to industrial dischargers into POTWs. *See* 40 C.F.R. part 403.12(p). Finally, it is clear to me that Defendants' storage of the AlumEtch–G waste before the HazMat incident, while it was allegedly off-gassing and while Defendants were allegedly attempting to discharge it by heavily diluting it, could be proved at trial by the government to be in furtherance of object # 1, operation of Luxury Wheels in violation of effluent and pretreatment stan-

dards under 33 U.S.C. § 1317(d) and the permit.

■ Finally, I disagree with Defendant's contention that the overt acts involving Rooter King's "hydrojetting" their waste-stream pipes describe only attempts to conceal illegal activity and, therefore, cannot as a matter of law constitute overt acts in furtherance of the alleged conspiracy. In determining whether acts of concealment can constitute overt acts, "a total distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been obtained, simply to cover up the crime." *Grunewald v. United States,* 353 U.S. 391, 405, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

Here, it is alleged that the hydrojetting acts occurred over the course of the conspiracy to remove chemical sludge blockages from Luxury Wheels' sewer line, thereby facilitating Defendants' operation of the business "in violation of effluent standards, prohibitions and pretreatment standards, in violation of Luxury Wheels' permit, and 33 U.S.C. § 1317(d)," object # 1 of the conspiracy. As these acts are described by the government in the second superseding indictment, they were designed to further the objectives of the conspiracy.

Defendants urge me to consider these overt acts as without illicit motive, and therefore improperly charged. Courts have long recognized that an overt act in itself need not be criminal when considered apart from the conspiracy as long as it follows or tends toward the accomplishment of the scheme, and is knowingly done in furtherance of some object or purpose of the conspiracy. *See Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942); *United States v. Palmeri,* 630 F.2d 192, 200–201 (3rd Cir.1980).

## 2) Motion in the Alternative for Bill of Particulars

As an alternative to dismissal, Defendants request that I order the government to provide the following information in a bill of particulars:

a) a list of all alleged coconspirators known to the grand jury;

b) the "individual" acting for Luxury Wheels in its role as coconspirator, as alleged;

c) the process wastes that were diluted, and what applicable regulations (e.g. the permit, CFR) said dilution violated, as alleged;

d) the pollutants containing high pH chemicals allegedly discharged into the floor drain, as alleged; and

e) the specific chemicals allegedly discharged directly to the floor drain and the specific dates of such discharges as allegedly occurring between May 1999 and February 2002.

■ The decision to grant a bill of particulars is within my sound discretion. *United States v. Sturmoski,* 971 F.2d 452, 460 (10th Cir.1992). The purpose of a bill of particulars is to inform a defendant of the charges against him with sufficient precision to allow him to prepare his defense. *United States v. Levine,* 983 F.2d 165, 166–167 (10th Cir.1992). A bill of particulars "is not a discovery device but may serve to amplif[y] the indictment by providing additional information." *United States v. Dunn,* 841 F.2d 1026, 1029 (10th Cir.1988). Nor is it proper to use a bill of particulars as a means for obtaining the evidentiary details of the government's case or information regarding the government's legal theories. *United States v. Gabriel,* 715 F.2d 1447, 1449 (10th Cir. 1983). "The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to

minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *Dunn*, 841 F.2d at 1029. The Tenth Circuit has consistently held that full discovery can obviate the need for a bill of particulars. *United States v. Kunzman*, 54 F.3d 1522, 1526 (10th Cir.1995).

Defendants submit that the particulars requested are justified given the complex regulatory framework of the environmental statutes providing the basis for the second superseding indictment, the Clean Water Act and the Resource Conservation and Recovery Act. Also, during the time period of the events at issue, Defendant Luxury Wheels operated under an industrial discharge permit issued by the POTW under the Clean Water Act. Finally, while Defendants acknowledge the government's informal and "good-faith," comprehensive provision of discovery, they ask for a formal bill of particulars that will limit the government's proof at trial to the extent Defendants might be prejudiced by government variance. *See Levine*, 983 F.2d at 166–167.

The government responds that the superseding indictment clearly sets forth information regarding the charges such that defendants may adequately prepare their defense and protect themselves against double jeopardy. According to the government, Defendants will not be surprised at trial because the government has provided extensive discovery and made numerous disclosures.

Moreover, the government contends that it has either answered Defendants' requests in the second superseding indictment or provided discovery that includes the requested information. It contends that a bill of particulars is neither warranted nor proper under these circumstances. It states that it has provided investigative reports, witness statements, grand jury transcripts, sampling information, expert discovery, and related materials. It argues it has done more than required under the law, including obtaining documents from third parties for discovery; supplying voluminous laboratory accreditation information; facilitating Persigo witness interviews; and seeking this Court's permission under Rule 6(e)(3) to disclose information from a separate grand jury investigation.

██ "An indictment is sufficient if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend, and if it enables a defendant to assert an acquittal or conviction in order to prevent being placed in jeopardy twice for the same offense." *United States v. Poole*, 929 F.2d 1476, 1479 (10th Cir.1991) (internal quotes removed). In the Tenth Circuit, moreover, it is usually sufficient for the indictment to track the language of the statute when the statute adequately expresses all of the elements to the offense. *Dunn*, 841 F.2d at 1029.

Specifically, the government contends that it has sufficiently set out the time period of the conspiracy in Count One. "An indictment charging a count of conspiracy is sufficiently precise as to the time frame if the operative period of the conspiracy is set out." *United States v. Edmonson*, 962 F.2d 1535, 1541 (10th Cir.1992). And the government has alleged specific objectives and listed specific overt acts and the dates and times they were allegedly performed, even though requests for a bill of particulars as to such specifics of a conspiracy are routinely denied. *See Dunn*, 841 F.2d at 1029 (defendant's request for specificity regarding time and manner in which defendant conspired with coconspirator and the date, time, place, witnesses, and circumstances concerning the conspiracy was appropriately denied).

 Defendants request the identity of all alleged co-conspirators. The gov-

ernment is not required to identify unindicted co-conspirators. *United States v. Paiva*, 892 F.2d 148, 155 (1st Cir.1989). Moreover, a bill of particulars cannot be used to obtain a list of government witnesses. *United States v. Barbieri*, 614 F.2d 715, 719–720 (10th Cir.1980). The government states that, these precedents notwithstanding, it has provided "more-than-sufficient" information to Defendants through discovery and a specific, October 12, 2004 disclosure letter. I agree.

Defendants request identification of process wastes that were diluted, and the applicable regulations the alleged dilution violated. The government says its full discovery and October 12, 2004 letter obviate justification for further disclosures. Again, I agree.

As to the regulations, permit limits, or other requirements, the government agrees that it will provide that information in a bill of particulars.

Defendants request identification of the pollutants containing high pH concentrations. The government contends discovery and the October 12 letter have eliminated the need for further specification. I agree.

 Defendants request identification of the specific chemicals allegedly discharged directly to the floor drain, and the specific dates of the alleged discharges. The government is not obligated to specify exact dates when Defendants committed alleged acts or other evidentiary details of the government's case. *United States v. Ellender*, 947 F.2d 748, 755–756 (5th Cir. 1991); *United States v. Armocida*, 515 F.2d 29, 44 (3rd Cir.1975); *United States v. Feola*, 651 F.Supp. 1068, 1133 (S.D.N.Y. 1987). Under those authorities, combined with the government's prior disclosures, including technical and chemical data it was not required to produce, disclosure of further particulars is not warranted.

Defendants readily admit that the government's discovery and disclosures amounts to "informal compliance." *See* Motion, 14. However, they request a bill of particulars to limit the government's evidence and theories at trial. *See Levine*, 983 F.2d at 166–167. But this alone, where as here, the government has provided Defendants all to which they are entitled, does not warrant a bill of particulars as to Count One.

### B. Defense Motion # 4: Count 18

#### 1) Motion to Dismiss

 Defendant, Luxury Wheels, moves to dismiss Count 18 of the second superseding indictment pursuant to Fed. R.Crim.P. 7(d), as surplusage to the indictment. It argues that the government "does not allege, as it must, that any such discharge from Luxury Wheels caused pass through to the POTW, or interference at the POTW." Count 18 states: "On or about July 25, 2002, in the State and District of Colorado, defendant LUXURY WHEELS did negligently discharge, or cause to be discharged, pollutants, namely, industrial wastewater, which contributed toxic gases, vapors or fumes *within the POTW* in quantities that caused acute worker health and/or safety problems, all in violation of [Title 33 U.S.C. § 1319(c)(1)(A); 40 C.F.R. part 403.5(b)(7); and 18 U.S.C. § 2]." (Emphasis added.)

40 C.F.R. part 403.5(a)(1) states: "(a)(1) General prohibitions. A User may not introduce into a POTW any pollutant(s) which cause Pass Through or Interference. These general prohibitions and the specific prohibitions in paragraph (b) of this section apply to each User introducing pollutants into a POTW whether or not the User is subject to other National Pretreatment Standards or any national, State, or local Pretreatment Requirements."

40 C.F.R. part 403.5(b)(7) states: "(b) ... the following pollutants shall not be

introduced into a POTW: ... (7) Pollutants which result in the presence of toxic gases, vapors, or fumes within the POTW in a quantity that may cause acute worker health and safety problems."

The government contends that Defendants misread the 403.5(b)(7) requirements. While 403.5(a) provides a "catch-all" as to any industrial user's discharges that cause "pass through" or "interference," part 403.5(b) specifically identifies types of discharges that, the government says, "inherently interfere" with POTWs. This is one reason, it contends, that alleging Defendants' discharges "passed through" or "interfered" with the POTW is unnecessary. I note that the second superseding indictment includes language not present in the first two indictments: "within the POTW." If there was any question when Defendants originally filed their motion (before the second superseding indictment) whether the government's allegation in Count 14 (now 18) incorporated the "pass through" or "interference" language, the phrase "within the POTW" in what is now Count 18 necessarily alleges that Defendants' unlawful discharges somehow affected the POTW.

That said, my reading of the regulations demonstrates that 403.5(a) and 403.5(b) are distinct. 403.5(a) considers "any pollutant(s) which cause Pass Through or Interference." 403.5(b) considers specifically categorized pollutants "in addition" to those listed in 403.5(a) whether or not they cause pass through or interference. This is clear because some of 403.5(b)'s listed pollutant categories are described specifically as causing interference with the POTW, while other listed pollutant categories are described with no reference whatsoever to pass through or interference. For example, consider the subsections of 403.5(b).

"(1) Pollutants which create a fire or explosion hazard in the POTW, including, but not limited to, wastestreams with a closed-cup flashpoint of less than 140 degrees Fahrenheit or 60 degrees Centigrade using the test methods specified in 40 CFR 261.21." This has nothing to do with "pass through" or "interference." The concern is fire or explosion hazards.

"(2) Pollutants which will cause corrosive structural damage to the POTW, but in no case Discharges with pH lower than 5.0, unless the works is specifically designed to accommodate such Discharges." The concern here is the acidic properties of some pollutants.

"(3) Solid or viscous pollutants in amounts which will cause obstruction to the flow in the POTW resulting in Interference." Here, "interference" is the explicit concern.

"(4) Any pollutant, including oxygen demanding pollutants (BOD, etc.) released in a Discharge at a flow rate and/or pollutant concentration which will cause Interference with the POTW." Here, interference is specific.

"(5) Heat in amounts which will inhibit biological activity in the POTW resulting in Interference, but in no case heat in such quantities that the temperature at the POTW Treatment Plant exceeds 40 C (104 F) unless the Approval Authority, upon request of the POTW, approves alternate temperature limits." Here, both heat and, explicitly, interference, are the foci.

"(6) Petroleum oil, nonbiodegradable cutting oil, or products of mineral oil origin in amounts that will cause interference or pass through." Both pass-through and interference are explicit.

"(7) Pollutants which result in the presence of toxic gases, vapors, or fumes within the POTW in a quantity that may cause acute worker health and safety problems." This is the section upon which the government has alleged Count 18. It has abso-

lutely no connection within the context of these subsections to either "pass through" or "interference."

"(8) Any trucked or hauled pollutants, except at discharge points designated by the POTW." Again, there is no connection to "pass through" or "interference."

■ The regulations specify "interference" or "pass through" when such is required to make a discharge prohibited. They do not require "interference" or "pass through" when the inherent nature of the discharge interferes with the POTW in some other way, such as through explosion, radiated heat, acid content, or detrimental effects on worker health. *See* Gov't Appendix, Ex. B., 55 Fed.Reg. 30082, 30088 (July 24, 1990) ("The health and safety of POTW workers has long been a serious concern of the Agency. There is no question that the generation of toxic gases and vapors can sometimes be dangerous to the health and safety of these workers, thus interfering with operations at the POTW ...."). Moreover, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *United States v. Power Eng'g Co.*, 303 F.3d 1232, 1237 (10th Cir.2002). In this case, the EPA promulgated the regulations at issue. Nonetheless, the same basic presumption of statutory interpretation applies to an agency's use of specific language in one part of a regulation but not in another. I conclude Count 18 is not "surplusage," and I deny Defendant's motion to dismiss it.

### 2) Motion in the Alternative for a Bill of Particulars

■ I incorporate the general authorities cited above regarding bills of particulars. Defendants contend in the alternative that they "cannot begin to assess this charge [Count 18] without knowing what 'gases, vapors or fumes' allegedly were released and without knowing what and where the 'POTW' is." Count 18 specifies the date of the alleged offense, and recites the statutory language and the specific regulation of the CWA that prohibits industrial dischargers from contributing "toxic gases, vapors or fumes within the POTW in quantities that cause acute worker health and/or safety problems." As such, the government argues, Count 18 provides Defendants with the information necessary to prepare their defense, to avoid surprise, and protect from double jeopardy in accordance with *Dunn*, 841 F.2d at 1029.

Moreover, the government contends, its full discovery has removed any element of surprise that defendants may assert, including witness statements of an injured POTW worker, a videotaped interview of that POTW worker, an expert toxicology report, an expert chemistry report regarding gas generation, and the POTW worker's medical records. As to the medical records, the government: 1) obtained a medical release from the injured POTW worker; 2) obtained the records from a third party; 3) applied for and received this Court's protective order for the POTW worker's medical records; and 4) released the records to Defendants pursuant to the protective order. Finally, the government contends, it facilitated Defendants' interview of the POTW worker.

Based on the governments' substantial discovery, additional disclosures, and informal assistance–unassailed by the Defense– I conclude Defendants make no credible claim for a bill of particulars as to Count 18.

### C. Defense Motion # 6: Counts 16 & 17

Defendants, in response to the government's allegation in RCRA Counts 16 and

17 of the second superseding indictment that Defendants violated "6 CCR 1007–3 § 262," request a bill of particulars specifying the violation of Colorado law. Defendants contend, and I agree, that there is no "section 262" of this chapter of the Colorado regulations. Rather, there is a "part 262" comprised of 89 separate sections applicable to hazardous-waste generators, none of which are specified by the government.

Because Counts 16 and 17 adequately track the statutory language of 42 U.S.C. § 6928(d)(2)(A) and (d)(3), respectively, and because I will strike reference to 6 CCR 107–3 part 262 as surplusage in a separate Order, a bill of particulars as to the Colorado regulations is not warranted. I deny Defendants' request.

ACCORDINGLY, IT IS ORDERED THAT:

1) DEFENDANTS' motion to dismiss Count 1 or for a bill of particulars is DENIED in part, and GRANTED in part to the limited extent the government has agreed to provide a bill of particulars as to regulations, permit limits, or other requirements;

2) DEFENDANTS' motion to dismiss Count 18 or for a bill of particulars is DENIED; and

3) DEFENDANTS' motion for a bill of particulars as to Counts 16 and 17 is DENIED as moot.